IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
February 24, 2022 Session Heard at Nashville

**STATE OF TENNESSEE v. TYSHON BOOKER**

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Knox County
No. 108568    G. Scott Green, Judge**

_____

**No. E2018-01439-SC-R11-CD**

_____

JEFFREY S. BIVINS, J., with whom ROGER A. PAGE, C.J., joins, dissenting.

I respectfully dissent from the result reached by a majority of the Court today. Quite frankly, I find the policy adopted as a result of the plurality opinion of Justice Lee and the concurring opinion of Justice Kirby to be sound. However, it is just that. It is a policy decision by which the majority today has pushed aside appropriate confines of judicial restraint and applied an evolving standards of decency/independent judgment analysis that impermissibly moves the Court into an area reserved to the legislative branch under the United States and Tennessee Constitutions.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On November 15, 2015, then sixteen-year-old Tyshon Booker ("Mr. Booker") shot and killed G'Metrick Caldwell ("the victim") while sitting in the victim's car on a residential street in East Knoxville. Mr. Booker and then seventeen-year-old Bradley Robinson ("Mr. Robinson") left the victim for dead in the vehicle, and Mr. Booker fled with the victim's cellphone, which he eventually discarded. Mr. Booker's finger and palm prints were found at the scene of the shooting along with shell casings from his nine-millimeter handgun.

Two days later, Mr. Booker was charged by petition in the Knox County Juvenile Court related to his involvement in the victim's death. The next day, he was arrested at the home of his neighbor, Linda Hatch ("Ms. Hatch").

---

[1] This opinion discusses only those facts relevant to the issue granted appeal by this Court. A full recitation of the facts is set out in the Court of Criminal Appeals' opinion. State v. Booker, No. E2018-10439-CCA-R3-CD, 2020 WL 1697367 (Tenn. Crim. App. Apr. 8, 2020), perm. app. granted, (Tenn. Sept. 16, 2020).

*A. Juvenile Court*

Following Mr. Booker's arrest, the State filed a "Notice and Motion to Transfer," seeking to transfer Mr. Booker to the Knox County Criminal Court to be tried as an adult. During the hearing that followed, the State put on forensic evidence linking Mr. Booker to the victim's vehicle. Additionally, Ms. Hatch testified that, the day after the shooting, Mr. Booker confessed to her that he and Mr. Robinson shot the victim in a failed robbery attempt.

In response, Mr. Booker attacked Ms. Hatch's credibility. He argued that she fabricated part of his confession to protect herself because she maintained an inappropriate relationship with him that included smoking marijuana together, helping him sell crack cocaine, and engaging in sexual activities. Dr. Keith Cruise, clinical psychologist, testified that Mr. Booker suffered from Post-Traumatic Stress Disorder, Moderate Cannabis Use Disorder, and Conduct Disorder stemming from numerous traumatic events he experienced during childhood, including witnessing both the death of a close relative and the shooting of a neighborhood child, as well as experiencing the murder of his paternal grandfather when Mr. Booker was in his early teens. Dr. Cruise explained that Mr. Booker was likely amenable to treatment but that adult correctional facilities were "ill equipped" to help him.

At the close of the hearing, the juvenile court considered the transfer factors required by Tennessee Code Annotated section 37-1-134(b).[2] In its oral ruling, the juvenile court explicitly found: (1) there were reasonable grounds to believe Mr. Booker committed the murder, (2) Mr. Booker was not committable to an institution for the developmentally disabled or mentally ill, (3) his prior delinquency records were "not of great importance here," (4) he received minimal past treatment efforts, (5) the nature of the alleged offense weighed heavily in favor of transfer, (6) any gang affiliation had little impact in the case, and (7) there was little hope of rehabilitating Mr. Booker in the twenty-one months remaining before his nineteenth birthday when he would be released from juvenile state custody. The juvenile court expressed reservations but, ultimately, based on its findings, the judge transferred Mr. Booker to criminal court to be tried as an adult.

---

[2] In making the [transfer] determination . . ., the court shall consider, among other matters:

(1) The extent and nature of the child's prior delinquency records;
(2) The nature of past treatment efforts and the nature of the child's response thereto;
(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
(4) Whether the offense was committed in an aggressive and premeditated manner;
(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and
(6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

Tenn. Code Ann. § 37-1-134(b) (2014) (amended 2022).

## B. Criminal Court

A Knox County Grand Jury indicted Mr. Booker on two counts of felony murder and two counts of especially aggravated robbery related to the victim's death. The case proceeded to a jury trial. At trial, the State's evidence was consistent with its presentation at the juvenile transfer hearing, including evidence of Mr. Booker's confession to Ms. Hatch and their improper relationship.

Mr. Booker took the stand and testified at trial that he shot the victim in self-defense. According to Mr. Booker, there was a fight between the victim and Mr. Robinson in the vehicle, during which Mr. Booker believed the victim reached for a gun. Mr. Booker denied telling Ms. Hatch that he and Mr. Robinson planned to rob the victim, but rather stated that the three planned only to drive around and smoke marijuana together.

The jury convicted Mr. Booker as charged on all counts. The felony murder convictions merged, and the trial court imposed the mandatory sentence of life imprisonment.[3] Following a sentencing hearing, the trial court sentenced Mr. Booker to twenty years for the especially aggravated robbery convictions, to be served concurrently with his life sentence.

## C. The Appeal

On appeal to the Court of Criminal Appeals, Mr. Booker raised, *inter alia*, constitutional challenges to Tennessee's automatic life sentence for first-degree murder. After briefing and oral argument, the Court of Criminal Appeals found no reversible error and affirmed Mr. Booker's convictions. State v. Booker, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *33 (Tenn. Crim. App. Apr. 8, 2020), perm. app. granted, (Tenn. Sept. 16, 2020). As to Mr. Booker's claim that his mandatory life sentence is unconstitutional under the Eighth Amendment to the United States Constitution and United States Supreme Court precedent, the court stated, "While we understand [Mr. Booker]'s argument, we must reject his invitation as we are bound by court precedent." Id. (citing State v. Collins, No. W2016-01819-CCA-R3-CD, 2018 WL 1876333, at *20 (Tenn. Crim.

---

[3] Tennessee law mandates a sentence of death, imprisonment for life without possibility of parole, or imprisonment for life for those convicted of felony murder. See Tenn. Code Ann. §§ 39-13-202(a)(2), (c)(1)–(3) (2014) (amended 2018, 2021 & 2022). The State must send notice to the defendant of its intent to seek the death penalty or life without parole. See Tenn. Code Ann. § 39-13-208(a)–(c) (2014) (amended 2021 & 2022). If the State seeks either the death penalty or life without parole, the sentencer has discretion to choose between the alternative sentences during a sentencing hearing. Tenn. Code Ann. § 39-13-204 (2014) (amended 2019, 2021 & 2022). When the State declines to pursue the death penalty or life without parole, the law mandates a sentence of life imprisonment if the defendant is convicted of first-degree murder. See Tenn. Code Ann. § 39-13-208(c) (2014). Mr. Booker was not eligible for the death penalty, see Roper v. Simmons, 543 U.S. 551, 568 (2005), and the record indicates that the State did not give notice of intent to seek life without parole. Therefore, Mr. Booker's sentence of life imprisonment was mandatory.

App. Apr. 18, 2018), <u>perm. app. denied</u>, (Tenn. Aug. 8, 2018), <u>cert. denied</u>, 139 S. Ct. 649 (2018)).

Mr. Booker then appealed to this Court. We granted the application only as to the issue of whether Tennessee's sentence of life imprisonment, as applied to juveniles, violates the United States or Tennessee Constitutions. Order, <u>State v. Booker</u>, No. E2018-01439-SC-R11-CD (Tenn. Sept. 16, 2020) (granting the application for permission to appeal). We also directed the parties to address what sentencing options may be available under Tennessee law if the sentence of life imprisonment is improper. <u>Id.</u> Approximately two months after oral argument in this case, the United States Supreme Court issued its opinion in <u>Jones v. Mississippi</u>, 141 S. Ct. 1307 (2021), which analyzed a related juvenile sentencing issue. We ordered the parties to submit supplemental briefing regarding whether <u>Jones</u> affects the analysis or outcome in this case.[4] Order, <u>State v. Booker</u>, No. E2018-01439-SC-R11-CD (Tenn. June 10, 2021) (directing the parties to submit supplemental briefs).

## II. ANALYSIS

The proper analysis for this challenge requires examination of the issue of whether the Eighth Amendment to the United States Constitution, as interpreted in <u>Miller v. Alabama</u>, 567 U.S. 460 (2012), requires this Court to hold that Tennessee's life sentence is unconstitutional as applied to juveniles. The Eighth Amendment, applicable to the States through the Fourteenth Amendment, states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Further, the United States Supreme Court has explained, "The Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions[, which] flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" <u>Roper v. Simmons</u>, 543 U.S. 551, 560 (2005) (second alteration in original) (quoting <u>Atkins v. Virginia</u>, 536 U.S. 304, 311 (2002); <u>Weems v. United States</u>, 217 U.S. 349, 367 (1910)).

When our Court is asked to interpret the Eighth Amendment, we are bound by the existing interpretations of the United States Supreme Court. <u>West v. Schofield</u>, 519 S.W.3d

---

[4] Both parties agree that the holding in <u>Jones</u> does not directly control the outcome in Mr. Booker's case. However, each party's supplemental brief argues that <u>Jones</u> ultimately supports that party's position in this case. Mr. Booker argues that his position rests on applying the principles of <u>Graham v. Florida</u>, 560 U.S. 48 (2010) and <u>Miller v. Alabama</u>, 567 U.S. 460 (2012), and because <u>Jones</u> explicitly upholds <u>Graham</u> and <u>Miller</u> as good law, <u>Jones</u> supports his position that Tennessee's life sentence is unconstitutional as applied to juveniles. The State maintains that <u>Miller</u> is distinguishable and that <u>Jones</u> implicitly approves of Tennessee's first-degree-murder sentencing scheme in a footnote. <u>See</u> <u>Jones</u>, 141 S. Ct. at 1318 n.5. Further, because Tennessee's sentencing scheme can result in discretion if the State pursues a life-without-parole sentence, the State argues that a life sentence is the lesser, not equal, punishment when compared to a life-without-parole sentence.

550, 566 (Tenn. 2017) (citing James v. City of Boise, 577 U.S. 306, 307 (2016) (per curiam) ("The Idaho Supreme Court, like any other state or federal court, is bound by this Court's interpretation of federal law."); Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530, 531 (2012) (per curiam) ("When this Court has fulfilled its duty to interpret federal law, a state court may not contradict or fail to implement the rule so established.")). We may not "interpret the United States Constitution to provide greater protection than [the United States Supreme Court's] own federal constitutional precedents provide." Arkansas v. Sullivan, 532 U.S. 769, 772 (2001) (citing Oregon v. Hass, 420 U.S. 714, 719 (1975)).[5]

## A. The Roper/Graham/Miller Trilogy

Over the last twenty years, the United States Supreme Court has held that the Eighth Amendment prohibits certain punishments and requires special procedural protections in the context of juvenile sentencing. See Roper, 543 U.S. at 568; Graham v. Florida, 560 U.S. 48, 74–75 (2010); Miller, 567 U.S. at 465; Montgomery v. Louisiana, 577 U.S. 190, 212 (2016). In Roper, the Court barred the use of the death penalty on any juvenile offender, regardless of the crime of conviction, as cruel and unusual under the Eighth Amendment. Roper, 543 U.S. at 568. First, the Court determined that a national consensus had formed against the juvenile death penalty supported by the understanding that juveniles are "categorically less culpable than the average criminal." Id. at 567 (citing Atkins, 536 U.S. at 316) (summarizing the objective indicia of national consensus against the juvenile death penalty as "the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice" (Id. at 552)). The Court also reasoned that the usual penological justifications for the death penalty, such as retribution and deterrence, no longer carried the same weight when considering the harshness of the penalty compared to certain inescapable characteristics of youth, such as immaturity and irresponsibility, vulnerability and susceptibility to negative influences coupled with a lack of control over their environment, and personality traits that are more transient and amenable to rehabilitation. Id. at 569–73. For these reasons, the Court concluded that the death penalty is disproportional when applied to any juvenile offender and violates the Eighth Amendment. Id. at 575.

Five years later, in Graham, the Supreme Court barred the use of life-without-parole sentences for juveniles convicted of nonhomicide crimes. Graham, 560 U.S. at 74. The Supreme Court determined that a national consensus had developed against the use of such a harsh punishment for juvenile nonhomicide offenders and held, in that context, such a sentence violates the Eighth Amendment. Id. at 67, 74. The Graham Court reiterated the same characteristics associated with youth first stated in Roper: "juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable and

---

[5] In my view, the result reached by the majority today does just that: the majority has interpreted the United States Constitution to provide greater protection than federal constitutional precedents provide.

susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" Id. at 68 (quoting Roper, 543 U.S. at 569–70). In the context of juvenile nonhomicide offenders, these same characteristics led the Supreme Court to conclude that a juvenile's already lowered moral culpability is twice diminished when he or she "did not kill or intend to kill," id. at 69, and, overall, juveniles cannot reliably be classified as incorrigible at the time of conviction, id. at 72–73.

The Graham Court described a life-without-parole sentence as "the second most severe penalty permitted by law," id. at 69 (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)), and something akin to the death penalty, which "alters the offender's life by a forfeiture that is irrevocable . . . without giving hope of restoration," id. at 69–70. Therefore, a life-without-parole sentence is disproportional when applied to juvenile nonhomicide offenders given the difficulty of differentiating between a juvenile "whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Id. at 68 (quoting Roper, 543 U.S. at 573). Similar to the reasoning in Roper, the Court concluded that deterrence and retribution do not support life-without-parole sentences in the context of juvenile nonhomicide offenders. Id. at 71–72. Further, while incapacitation may justify a lengthy punishment for a serious nonhomicide crime, it does not support life without parole for juvenile nonhomicide offenders because it requires a sentencer to make the decision that a juvenile "forever will be a danger to society" at the outset, id. at 72, even though "incorrigibility is inconsistent with youth," id. at 73 (quoting Workman v. Commonwealth, 429 S.W.2d 374, 378 (Ky. 1968)). The Supreme Court also explained that such a punishment is inconsistent with rehabilitation as a goal because life without parole "forswears altogether the rehabilitative ideal[ ] [b]y denying the defendant the right to reenter the community" despite a juvenile's capacity for reform. Id. at 73–74. Therefore, a sentence of life without parole is cruel and unusual and violates the Eighth Amendment as applied to a juvenile convicted of a nonhomicide crime. Id. at 74.

Just two years later, the Court decided Miller, which held that life without parole could be imposed on a juvenile convicted of *homicide*, but only under a discretionary sentencing scheme. Miller, 567 U.S. at 465. Two fourteen-year-old offenders, Kuntrell Jackson and Evan Miller, were convicted of capital murder and the only available sentence under the law of their respective states was life without parole. Id. at 465–69; see Ark. Code. Ann. § 5-4-104(b) (1997) (providing that "[a] defendant convicted of capital murder . . . shall be sentenced to death or life imprisonment without parole"); Ala. Code §§ 13A-5-40(a)(9), 13A-6-2(c) (1982) (fixing murder in the course of arson as a capital offense subject to life without parole). Therefore, both Mr. Jackson and Mr. Miller were sentenced under mandatory sentencing schemes, which did not allow for consideration of their youth or an option to impose a lesser punishment than life without parole. Miller, 567 U.S at 465–69. Their cases were consolidated on review.

The <u>Miller</u> Court explained that there may be the type of rare incorrigible youth who commits homicide and deserves a sentence of life without parole. <u>Id.</u> at 479–80. However, given all that <u>Roper</u> and <u>Graham</u> said about youth, the "appropriate occasions for sentencing juveniles [to life without parole] will be uncommon" and require a sentencing scheme that allows for the sentencer to consider the offender's "youth and attendant characteristics." <u>Id.</u> at 479, 483. If the sentencing scheme is mandatory and "mak[es] youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," the Supreme Court explained, the "scheme poses too great a risk of a disproportionate punishment" and runs afoul of the Eighth Amendment. <u>Id.</u> at 479. <u>Miller</u> relied on the same characteristics of youth announced in <u>Roper</u> and reiterated in <u>Graham</u>, that a juvenile's "transient rashness, proclivity for risk, and inability to assess consequences" leads to diminished criminal culpability and an increased ability to reform and be rehabilitated, and determined that "none of what [its precedents] said about children . . . is crime-specific." <u>Id.</u> at 471–73.

Building on <u>Graham</u>'s conclusion that life without parole "alters the offender's life by a forfeiture that is irrevocable," the <u>Miller</u> Court reasoned that individualized sentencing and consideration of "the 'mitigating qualities of youth'" are particularly relevant when considering the constitutionality of a life-without-parole sentence imposed on a juvenile. <u>Id.</u> at 475–76 (first quoting <u>Graham</u>, 560 U.S. at 69; then quoting <u>Johnson v. Texas</u>, 509 U.S. 350, 367 (1993)). Both <u>Roper</u> and <u>Graham</u>, the Supreme Court acknowledged, "teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." <u>Id.</u> at 477. Therefore, mandatory imposition of life without parole, which ignores the very attributes that make children constitutionally different from adults and disregards the offender's potential for rehabilitation, violates the Eighth Amendment. <u>Id.</u> at 479. The Supreme Court clarified that its holding, unlike <u>Graham</u>, did not categorically bar life-without-parole sentences for juvenile homicide offenders. <u>Id.</u> at 479–80. However, after <u>Miller</u>, the Eighth Amendment requires that a sentencer "take into account how children are different, and how those differences counsel against irrevocably sentencing [a juvenile] to a lifetime in prison." <u>Id.</u> at 480.

I do agree with the majority that the <u>Roper</u>/<u>Graham</u>/<u>Miller</u> trilogy[6] centers around one foundational principle: "children are constitutionally different from adults for purposes of sentencing." <u>Id.</u> at 471. In support of this principle, each holding builds off prior precedent to support the conclusion: juvenile offenders generally are less culpable than their adult counterparts and more responsive and amenable to rehabilitation, which makes

---

[6] Following <u>Miller</u>, the United States Supreme Court held in <u>Montgomery v. Louisiana</u>, 577 U.S. 190, 212 (2016), that <u>Miller</u> established a new rule of constitutional law that applies retroactively on collateral review. The Court also recently clarified that "[i]n light of th[e] explicit language" in <u>Miller</u> and <u>Montgomery</u>, there is no formal factfinding requirement regarding a child's incorrigibility before sentencing a juvenile homicide offender to life without parole, so long as the overall sentencing scheme is discretionary. <u>Jones</u>, 141 S. Ct. at 1311.

them less deserving of the most severe punishments at law. Id. (citing Graham, 560 U.S. at 68); see also Roper, 543 U.S. at 569–71.

Additionally, the trilogy recognizes that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." Miller, 567 U.S. at 472. Retribution, incapacitation, deterrence, and rehabilitation provide little support for either the death penalty or life-without-parole sentences once a court considers that juveniles, in general, have diminished culpability, are unlikely to contemplate the potential for punishment before acting, and cannot with reliability be classified as incorrigible or irredeemable at such a young age. See id. at 472–73; Graham, 560 U.S. at 71–73; Roper, 543 U.S. at 571. The Supreme Court cemented the interconnectedness of this line of cases in Miller when it stated that "none of what is said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." Miller, 567 U.S. at 473. Therefore, whether the crime of conviction is homicide or something less severe in the eyes of the law, the rationale for limiting the imposition of these harsh sentencing practices remains the same.

These cases and their collective underpinning are compelling. However, in answering the federal constitutional question before the Court today, "our duty to follow binding precedent is fixed upon case-specific holdings rather than general expressions in an opinion that exceed the scope of any particular holding." State v. Slocumb, 827 S.E.2d 148, 153 (S.C. 2019) (citing Vasquez v. Commonwealth, 781 S.E.2d 920, 926 (Va. 2016)). Because Mr. Booker argues that the principles of both Graham and Miller compel this Court to hold that Tennessee's life sentence is unconstitutional as applied to juveniles, the proper analysis narrows the focus to their specific holdings.

### B. Graham and Miller

In Graham, the Supreme Court held that "for a juvenile offender who did not commit homicide[,] the Eighth Amendment forbids the sentence of life without parole." Graham, 560 U.S. at 74. The Supreme Court clarified its holding:

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life[-]without[-]parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of

incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.

Id. at 75.

After Graham, a few points are clear: Tennessee is prohibited from sentencing juvenile *nonhomicide* offenders to life without parole; juvenile nonhomicide offenders can remain incarcerated for life so long as they are given a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation;" and it is for our State to decide "the means and mechanisms for compliance" with Graham's holding. Id. Less clear from Graham, however, is how to define a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. That question, while an important one, is not determinative for the analysis today because Graham is distinguishable from this case. Simply put, Graham applies to cases in which a juvenile is convicted of a nonhomicide crime and sentenced to life without parole. In this case, Mr. Booker was convicted of homicide and received a life sentence—not a sentence of life without parole.

In Miller, the Supreme Court held that the Eighth Amendment forbids mandatory imposition of a life-without-parole sentence on juveniles convicted of homicide. Miller, 567 U.S. at 479–80; see Montgomery, 577 U.S. at 193 ("In Miller[], the Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing."); Jones, 141 S. Ct. at 1311 ("Under Miller[ ], an individual who commits a homicide when he or she is under [eighteen] may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment."). Therefore, Miller does not prohibit life-without-parole sentences, nor does it prohibit all mandatory sentencing schemes in the juvenile context. Miller, 567 U.S. at 480. Miller requires that, before a juvenile homicide offender is sentenced to life without parole, a sentencer must consider the offender's youth and its accompanying characteristics before deciding the juvenile is incorrigible and must spend the rest of his days in prison. Id. at 479–80.

The Supreme Court has clarified that "Miller did not impose a formal factfinding requirement" on the sentencer. Montgomery, 577 U.S. at 211. Rather, it is up to States to determine the mechanisms to comply with Miller's mandate. Id. This means that not only is the sentencer relieved of making a specific finding of incorrigibility, but also he or she is relieved of making *any* specific factual findings on the record. Jones, 141 S. Ct. at 1316, 1320 (stating "Miller did not require the sentencer to make a separate finding of permanent incorrigibility before imposing [life without parole]" and "Miller did not say a word about requiring some kind of particular sentencing explanation with an implicit finding of

permanent incorrigibility, as <u>Montgomery</u> later confirmed"). The discretionary scheme itself is sufficient, the Supreme Court explained, because it "allows the sentencer to consider the [offender's] youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the [offender's] age." <u>Id.</u> at 1318.

After <u>Miller</u> (and <u>Montgomery</u>/<u>Jones</u>), two points are clear: (1) Tennessee can impose a life-without-parole sentence on a juvenile *homicide* offender only if it does so under a discretionary sentencing scheme; and (2) federal constitutional law, based upon Supreme Court precedent, does not require a sentencer to make any specific findings on the record before sentencing a juvenile homicide offender to life without parole, including that the juvenile is incorrigible.[7]

Because Mr. Booker was under the age of eighteen at the time he committed a homicide, and because his life sentence was mandatorily imposed,[8] <u>Miller</u>'s holding could be viewed as providing guidance in this case. One, however, cannot ignore an important distinguishing fact: Mr. Booker was sentenced to life imprisonment, not life without parole. Thus, the main issue Mr. Booker asks this Court to contemplate, and what is still left unclear following <u>Miller</u> and its progeny, is: do the Eighth Amendment protections, as interpreted by <u>Miller</u>, apply to sentences that are not life without parole in name but could

---

[7] Few state courts have interpreted or applied <u>Jones</u> since it was released. Among the courts that have, the above-mentioned rules are clear. <u>See, e.g.</u>, <u>Holmes v. State</u>, 859 S.E.2d 475, 480–81 (Ga. 2021); <u>Elliott v. State</u>, No. CR-20-407, 2021 WL 2012632, at *5 (Ark. May 20, 2021); <u>Wynn v. State</u>, No. CR-19-0589, 2021 WL 2177656, at *8–9 (Ala. Crim. App. May 28, 2021); <u>State v. Miller</u>, 861 S.E.2d 373, 380 (S.C. Ct. App. 2021); <u>Harned v. Amsberry</u>, 499 P.3d 825, 833 (Or. Ct. App. 2021). However, <u>Jones</u> has left some state court decisions now in question. <u>See</u> <u>People v. Dorsey</u>, 183 N.E.3d 715, 727 (Ill. 2021) (determining that Illinois Supreme Court precedent, which held the protections of <u>Miller</u> and <u>Montgomery</u> apply equally to mandatory *and* discretionary life-without-parole sentences is "questionable in light of <u>Jones</u>," but that, overall, <u>Jones</u> approves of the state's discretionary sentencing scheme at issue in that case); <u>People v. Ruiz</u>, No. 1-18-2401, 2021 WL 2102850, at *12 (Ill. App. Ct. May 25, 2021) (concluding that the Illinois Supreme Court can require more fact finding procedures under <u>Miller</u> than those stated in <u>Jones</u>); <u>People v. Terry</u>, No. 1-18-2084, 2021 WL 2290798, at *4 (Ill. App. Ct. May 28, 2021) (stating that the impact of <u>Jones</u> is "unclear" on Illinois Supreme Court precedent).

[8] As previously noted, although Tennessee's first-degree murder sentencing scheme *can* result in the sentencer having discretion, *supra* note 3, Mr. Booker's sentence of life imprisonment was imposed mandatorily because he is not eligible for the death penalty and the State did not seek a sentence of life without parole. Had the State sought life without parole, under Tennessee law, a jury would have had discretion to sentence Mr. Booker to either life without parole—if it unanimously determined that the State proved at least one aggravating factor beyond a reasonable doubt—or life imprisonment. <u>See</u> Tenn. Code Ann. § 39-13-207(a)–(c) (2014) (amended 2021 & 2022). In Tennessee, so long as the proper notice is given, it appears that this type of sentencing discretion is what <u>Miller</u> suggests as a constitutionally sufficient procedure for sentencing a juvenile to life without parole. <u>Miller</u>, 567 U.S. at 478–80, 489. However, that is not the scenario presented today because the State did not seek a life-without-parole sentence in this case.

be considered the functional equivalent to a life-without-parole sentence? Stated another way, does Tennessee's life sentence—a sixty-year sentence that requires at least fifty-one years imprisonment before an opportunity for release—offend the Eighth Amendment and principles of Miller when applied to a juvenile convicted of homicide?

## C. State and Federal Court Analysis of the Functional Equivalency Issue[9]

Tennessee clearly is not the only state court to contemplate whether Miller applies to lengthy sentences that are not life without parole in name. Because the United States Supreme Court has not answered this question, and it is an issue of first impression for this Court, we consult the decisions of our lower courts, other state courts, and federal courts for guidance. Overall, research shows there is no consensus on this issue.

Tennessee courts consistently have held that Tennessee's life sentence is not unconstitutional under the Eighth Amendment and Miller because it "permits release eligibility after serving fifty-one years." State v. Polochak, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *34 (Tenn. Crim. App. Jan. 16, 2015); see also State v. Douglas, No. W2020-01012-CCA-R3-CD, 2021 WL 4480904, at *24–25 (Tenn. Crim. App. Sept. 30, 2021) (listing other Tennessee cases). Additionally, the courts have recognized that "[w]hile the next logical next step may be to extend protection to these types of sentences, that is not the precedent which now exists." Polochak, 2015 WL 226566, at *34 (quoting Perry v. State, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014)); see also State v. Fitzpatrick, No. M2018-02178-CCA-R3-CD, 2021 WL 3876968, at *8 (Tenn. Crim. App. Aug. 31, 2021) ("The power to break with well-established precedent does not lie with this court, and we are not prepared to expand the parameters of the Eighth Amendment in this regard, notwithstanding the fact that the Defendant's sentence 'may push, and possibly exceed, the bounds of his life expectancy[.]'" (alteration in original) (quoting State v. King, No. W2019-01796-CCA-R3-CD, 2020 WL 5352154, at *2 (Tenn. Crim. App. Sept. 4, 2020)).

---

[9] The concurring opinion professes that our lengthy discussion of the functional equivalency issue is a "puzzler" and "makes little sense" because neither the plurality nor the concurring opinion relies on such an analysis. The answer as to why such a detailed discussion is necessary is two-fold and very simple. First, Mr. Booker raised this issue as a primary argument to support his position. Indeed, Mr. Booker's counsel spent the majority of his time at the first oral argument of this appeal advocating for an application of Miller to this case, while mentioning an evolving standards of decency/independent judgment analysis only in passing during rebuttal. Second, the overwhelming number of other state and federal courts that have invalidated juvenile sentences under the Eighth Amendment in similar cases have done so on the basis of a functional equivalency analysis. Indeed, today this Court becomes the only court in the country to base its holding on "the well-established Supreme Court [Eighth Amendment] analytical framework" in order to find such a statute unconstitutional under the United States Constitution. Of course, this "well-established framework" is an evolving standards of decency/independent judgment analysis. The fact that both the plurality and the concurrence for some reason chose to ignore this important argument is their choice and not binding or limiting upon us.

As for other state courts, some have decided that the protections of Miller apply equally to a juvenile homicide offender sentenced to life without parole and to a lengthy term of years when the lengthy term-of-years sentence is the functional equivalent of life without parole or a de facto life-without-parole sentence.[10] See Casiano v. Comm'r of Corrs., 115 A.3d 1031, 1044 (Conn. 2015) (concluding that Miller applies to a sentence not based on its label but rather because it is lengthy, does not offer parole, and requires the juvenile to actually be imprisoned for the rest of his or her life); State v. Shanahan, 445 P.3d 152, 159 (Idaho 2019) ("Because the Supreme Court has 'counsel[ed] against irrevocably sentencing [juveniles] to a lifetime in prison' without consideration of the Miller factors, we conclude that the rationale[] of Miller . . . also extend[s] to lengthy fixed sentences that are the functional equivalent of a determinate life sentence . . . ." (first and second alteration in original) (citation omitted)); People v. Reyes, 63 N.E.3d 884, 888 (Ill. 2016) (per curiam) ("[W]e hold that sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the [E]ighth [A]mendment."); State v. Ragland, 836 N.W.2d 107, 121–22 (Iowa 2013) (holding under the Eighth Amendment and Iowa state constitution that "Miller applies to sentences that are the functional equivalent of life without parole"); Carter v. State, 192 A.3d 695, 725 (Md. 2018) ("The initial question is whether a sentence stated as a term of years for a juvenile offender can ever be regarded as a sentence of life without parole for purposes of the Eighth Amendment. It seems a matter of common sense that the answer must be 'yes.'"); State ex rel. Carr v. Wallace, 527 S.W.3d 55, 60 (Mo. 2017) (en banc) ("Miller controls because [the defendant] was sentenced to the harshest penalty other than death available under a mandatory sentencing scheme without the jury having any opportunity to consider the mitigating and attendant circumstances of his youth."); State v. Kelliher, 873 S.E.2d 366, 370 (N.C. 2022) (holding that "any sentence or combination of sentences which, considered together, requires a juvenile offender to serve more than forty years in prison before becoming eligible for parole is a de facto sentence of life without parole within the meaning of article I, section 27 of the North Carolina Constitution because it deprives the juvenile of a genuine opportunity to demonstrate he or she has been rehabilitated and to establish a meaningful life outside of prison"); State v. Zuber, 152 A.3d 197, 201 (N.J. 2017) ("We find that the same concerns apply to sentences that are the practical equivalent of life without parole . . . . The proper focus belongs on the amount of real time a juvenile will spend in jail and not on the formal label attached to [the] sentence."); Ira v. Janecka, 419 P.3d 161, 167 (N.M. 2018) ("We conclude that the analysis contained within Roper and its progeny should be applied to a multiple term-of-years sentence."); White v. Premo, 443 P.3d 597, 605 (Or. 2019) ("We know of no state high court that has held that a sentence in excess of [fifty] years for a single homicide provides a juvenile with a meaningful opportunity for release. Given those particular circumstances, we conclude that petitioner's [fifty-four-year-mandatory-minimum] sentence is sufficiently lengthy that a Miller

_____

[10] Curiously, neither Justice Lee's plurality opinion nor Justice Kirby's concurring opinion relies on a conclusion that Tennessee's statute constitutes a de facto sentence of life without parole.

analysis is required." (footnote and citation omitted)); State v. Ramos, 387 P.3d 650, 659 (Wash. 2017) ("We now join the majority of jurisdictions that have considered the question and hold that Miller does apply to juvenile homicide offenders facing de facto life-without-parole sentences.").

However, there is no clear line to determine when a sentence becomes the functional equivalent of life without parole. Compare Carter, 192 A.3d at 727–30, 734 (discussing five benchmarks courts have used to determine when a sentence becomes the functional equivalent to life without parole and concluding that fifty years before parole eligibility is equivalent to life without parole for purposes of the Eighth Amendment); Zuber, 152 A.3d at 212–13 (stating that Miller applies to a minimum sentence of fifty-five years imprisonment); Casiano, 115 A.3d at 1045–47 (stating that a sentence of fifty years imprisonment without parole triggers Miller protections); Reyes, 63 N.E.3d at 888 (concluding that a mandatory minimum sentence of eighty-nine years is a de facto life-without-parole sentence), with Shanahan, 445 P.3d at 160–61 (determining a fixed thirty-five-year sentence without the possibility of parole was not the functional equivalent of life without parole); State v. Diaz, 887 N.W.2d 751, 768 (S.D. 2016) (concluding that forty years in prison before parole eligibility was not a de facto life sentence); People v. Dorsey, 183 N.E.3d 715, 728–29 (Ill. 2021) (determining that a seventy-six-year sentence was not a de facto life-without-parole sentence because good-time credits made release after thirty-eight years a possibility).

Other state courts have reached the opposite conclusion, that Miller's holding is narrower and applies only to sentences that are life without parole in name. See Lucero v. People, 394 P.3d 1128, 1132 (Colo. 2017) ("Graham and Miller apply only where a juvenile is sentenced to the specific sentence of life without the possibility of parole for one offense."); Wilson v. State, 157 N.E.3d 1163, 1176 (Ind. 2020) ("Miller, Graham, and Montgomery expressly indicate their holdings apply only to life-without-parole sentences."); Hobbs v. Turner, 431 S.W.3d 283, 289 (Ark. 2014) ("[The defendant] was not subjected as a juvenile homicide offender to a mandatory life-without-parole sentence; therefore, Miller, is inapplicable."); Lewis v. State, 428 S.W.3d 860, 863–64 (Tex. Crim. App. 2014) (holding that Miller did not apply to single sentence of life imprisonment with the possibility of parole after forty years imposed mandatorily on a juvenile homicide offender).

This debate is further complicated by the fact that the majority of states that have answered the functional equivalency question have done so in the context of an aggregate sentence for multiple crimes, rather than a single term-of-years sentence, as is the factual scenario presented in this case. But see White, 443 P.3d at 603–04 (determining that Miller applies to a determinate 800-month minimum sentence for a single murder); Parker v. State, 119 So.3d 987, 996–99 (Miss. 2013) (concluding that Miller applies to a single sentence for "natural life" that is not eligible for parole but allows for conditional release at age sixty-five); Shanahan, 445 P.3d at 158–61 (acknowledging that Miller can apply to

a single sentence that is the functional equivalent of life without parole but that thirty-five years before parole eligibility was not the functional equivalent of life without parole).

To reinforce the fact that the answer to this particular question remains unclear, federal jurisdictions have come down on both sides of this issue in the habeas corpus context.[11] Compare Starks v. Easterling, 659 Fed. Appx. 277, 280–81 (6th Cir. 2016) ("Because the Supreme Court has not yet explicitly held that the Eighth Amendment extends to juvenile sentences that are the functional equivalent of life, and given the fact that lower courts are divided about the scope of Miller, we hold that the Tennessee courts' decisions were not contrary to, or an unreasonable application of, clearly established federal law . . . ."), cert. denied, (Jan. 17, 2017); Demirdjian v. Gipson, 832 F.3d 1060, 1076–77 (9th Cir. 2016) (upholding the state court's decision that Miller's ban on mandatory life-without-parole sentences did not apply to defendant's fifty-year sentence with parole eligibility at sixty-six years of age); Webster v. Royce, No. 97-cv-2146 (NG), 2021 WL 3709287, at *17 (E.D.N.Y Aug. 20, 2021) (holding that it was not unreasonable for a state court to deny petitioner relief from a sentence of fifty years before parole eligibility because "the Supreme Court has not 'clearly established' that a sentence of [fifty] years to life imposed on a juvenile is the 'functional equivalent' of life without parole"), with McKinley v. Butler, 809 F.3d 908, 911 (7th Cir. 2016) (overturning a state court decision and expressing reservations based on Miller about a 100-year sentence imposed on a juvenile). In short, courts around the country are divided concerning Miller's application to lengthy sentences such as Mr. Booker's.

At this time, given no controlling authority to the contrary, I would conclude that we should remain consistent with Tennessee's lower courts and join the other state courts that have adopted a narrower interpretation of Miller's holding and United States Supreme Court Eighth Amendment precedent. See Slocumb, 827 S.E.2d at 156 ("Rather than predict what the Supreme Court may or may not do, we believe the proper course is to respect the Supreme Court's admonition that lower courts must refrain from extending federal constitutional protections beyond the line drawn by the Supreme Court."); Turner, 431 S.W.3d at 289 ("Miller prohibits a sentencing scheme that *mandates* life in prison without the possibility of parole for juveniles homicide offenders. [The defendant] was not subjected . . . to a mandatory life-without-parole sentence; therefore, Miller is inapplicable." (citation omitted)); Wilson, 157 N.E.3d at 1175 ("And determining what sentence constitutes a 'de facto life sentence' would be a task completely unmoored from the language of Miller.").

---

[11] Under the Antiterrorism and Effective Death Penalty Act, a federal district court may grant relief to a petitioner only if his or her claim was heard on the merits and "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Therefore, the conclusion of the federal court in the habeas corpus context is not necessarily a review of the petitioner's claim on the merits and has different weight or precedential value.

I reach this decision for two reasons. First, <u>Miller</u>'s holding expressly applies to life-without-parole sentences, and Tennessee's life sentence is not that.[12] Under Tennessee law, a life sentence guarantees release after sixty years and offers release as early as fifty-one years, if the offender earns good-time credits. <u>Brown v. Jordan</u>, 563 S.W.3d 196, 200 (Tenn. 2018) ("[F]or first-degree murders committed *on or after* July 1, 1995, a defendant must serve one hundred percent of sixty years less any sentence credits received, but the sentence credits cannot operate to reduce the sentence imposed by more than fifteen percent.") (citing Tenn. Code Ann. § 40-35-501(i)). Therefore, not only does life imprisonment under Tennessee law guarantee release at a certain point, the sentencing scheme offers Mr. Booker the opportunity to obtain release nine years early through earning good-time credits. <u>See</u> Tenn. Code Ann. § 40-35-501(h)(1), (i)(1), & (i)(2)(a) (2014) (amended 2020); Tenn. Code Ann. § 41-21-236 (2014). For a juvenile like Mr. Booker, who is sentenced to life imprisonment at the age of sixteen or seventeen, he or she can expect to remain incarcerated until at least age sixty-seven and at most age seventy-seven. While quite lengthy, I cannot say that Tennessee's life sentence, considered under the current Eighth Amendment jurisprudence of the United States Supreme Court, is equivalent to a life-without-parole sentence with no meaningful opportunity to obtain release.[13] <u>See</u> <u>United States v. Mathurin</u>, 868 F.3d 921, 934–36 (11th Cir. 2017) (determining that a sentencing scheme that offered the ability to earn good-time credits and reduce a sentence by seven years gave a juvenile offender "a reason to pursue and exhibit 'maturity and rehabilitation'" and thus served as a "'meaningful opportunity to obtain release' during [the juvenile's] lifetime" (quoting <u>Graham</u>, 560 U.S. at 75)); <u>Dorsey</u>, 183 N.E.3d at 733 (concluding that a sentence did not violate the Eighth Amendment or constitute a de facto life-without-parole sentence because the state's day-for-day sentencing credit provided a defendant with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" (quoting <u>Graham</u>, 560 U.S. at 75)).

I do not believe it is wise or appropriate to extend <u>Miller,</u> or other existing Eighth Amendment precedent, by predicting whether the United States Supreme Court would extend its jurisprudence and hold unconstitutional a lengthy term-of-years sentence in this

---

[12] Indeed, as previously noted, Tennessee law allows juveniles tried as adults to be subject to a sentence of life without parole. There appears to be no issue regarding the constitutionality of the life-without-parole statute.

[13] Both Mr. Booker and the amici curiae parties argue that a person who spends the majority of his or her life incarcerated has a lower overall life expectancy and that there is convincing data that a juvenile incarcerated for fifty-one years or more is likely to die in prison before the opportunity for release. <u>See</u> Brief of Amici Curiae National Association of Criminal Defense Attorneys, Tennessee Association of Criminal Defense Attorneys, Amos Brown, and Charles Lowe-Kelly, <u>State v. Booker</u>, No. E2018-01439-SC-R11-CD, at 23–25 (Tenn. Dec. 2, 2020). While this data may be compelling, evaluation of such research and its impact on whether a particular sentence is appropriate punishment for a crime is a determination best left to the legislature.

context. See, e.g., Wilson, 157 N.E.3d at 1175 ("[D]etermining the reach of the [Eighth Amendment's cruel and unusual punishment] clause is inherently a line drawing exercise best left to the U.S. Supreme Court."). This Court must apply the holdings of the United States Supreme Court as they are written, not what we wish were true about the holding or how far we would like for the holding to extend.[14] See, e.g., Jones, 141 S. Ct. at 1321–22 ("The dissent draws inferences about what, in the dissent's view, Miller and Montgomery 'must have done' in order for the decisions to 'make any sense.' We instead rely on what Miller and Montgomery said . . . ." (citation omitted)).

The United States Supreme Court certainly could choose to extend its aforementioned Eighth Amendment jurisprudence to a lengthy term-of-years sentence. However, unlike the majority, I do not find it appropriate to extend its precedent further than its own language. In no way do I wish to diminish the fact that Mr. Booker's sentence requires over half a century of incarceration before any opportunity for release.[15] However, for constitutional purposes, I cannot ignore that it not only offers the opportunity for release but also guarantees it. Therefore, Miller does not apply.

---

[14] Mr. Booker argues, and Justice Kirby's concurring opinion concludes, that a new national consensus has formed since Miller that sentences that require a minimum of fifty years of incarceration or more, when applied to a juvenile, trigger the protections of Graham and Miller. The United States Supreme Court may very well choose to take up this issue and hold in accord. However, the data relied on by the Supreme Court in Roper and Graham to reach the conclusion that a new national consensus had formed with regard to the particular punishment in those cases varies widely. See Roper, 543 U.S. at 564–68 (relying on legislative enactments and infrequent imposition of the juvenile death penalty in a majority of states); Graham, 560 U.S. at 62–67 (relying on actual sentencing practices rather than legislative action or inaction). Perhaps more importantly, the purported national consensus applied in this case in no way developed in an organic manner as was the situation in Roper and Graham. Many of the legislative and judicial decisions relied upon by the concurrence arose simply as responses to Miller. As a result, I do not believe that we can predict with confidence what the Supreme Court may say when viewing the existing data Mr. Booker highlights in his brief. Likewise, given these circumstances, I am not prepared to find that a national consensus exists in this case similar to the ones found in Roper and Graham.

[15] Both the plurality and especially the concurring opinion make much of the fact that Tennessee imposes the harshest sentence in the nation in terms of years of service. Yet, no less than Justice Anthony Kennedy, the author of the majority opinions in Roper, Graham, and Montgomery, and one of the Justices in the majority in Miller, has written very interestingly regarding a state having the most severe punishment for a particular crime. In Harmelin v. Michigan, a case relied upon in the plurality opinion, Justice Kennedy opines as follows:

> [M]arked divergences . . . in the length of prescribed prison terms are the inevitable, often beneficial, result of the federal structure. . . . Thus, the circumstance that a State has the most severe punishment for a particular crime does not by itself render the punishment grossly disproportionate. Our Constitution is made for people of fundamentally differing views. . . . Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State.

501 U.S. 957, 999–1000 (1991) (Kennedy, J., concurring) (internal quotation marks and citation omitted).

Second, this Court has long recognized that it is the distinct job of the legislature to make policy decisions and to determine the appropriate sentence or punishment for a crime. See State v. Gentry, 538 S.W.3d 413, 420 (Tenn. 2017) (citing State v. Burdin, 924 S.W.2d 82, 87 (Tenn. 1996)); State v. Harris, 844 S.W.2d 601, 602 (Tenn. 1992) (citing Solem v. Helm, 463 U.S. 277, 289–90 (1983)). In the specific context of Miller, the Supreme Court has reiterated that States are not "preclude[d] . . . from imposing additional sentencing limits in cases involving defendants under [eighteen] convicted of murder." Jones, 141 S. Ct. at 1323. In fact, since Miller, a majority of the state legislatures and the District of Columbia have acted to reform their criminal sentencing laws as they relate to juvenile homicide offenders.[16] However, to date, Tennessee's legislature is not among them. Even very recently, the General Assembly has considered bills to reform Tennessee's first-degree-murder sentencing scheme not only for juveniles but also for all adult offenders. See S.B. 1452, 112th Gen. Assem. (2021) (proposing to reduce the minimum amount of time a juvenile convicted of first-degree murder is required to serve before becoming release-eligible from fifty-one years to thirty years); S.B. 0561, 112th Gen. Assem. (2021) (proposing to reduce the portion of a person's sentence for first-degree murder that must be served prior to becoming eligible for parole to sixty percent of sixty years if sentenced to imprisonment for life for an offense committed during certain dates or 100 percent of sixty years if sentenced to imprisonment for life without the possibility of parole). In fact, Senate Bill 0561, which proposed parole eligibility after thirty-six years for offenders convicted of first-degree murder during a certain time and sentenced to life imprisonment, among other provisions, passed with only four dissenting votes in the Senate on April 22, 2021.[17] However, this measure, and similar measures, have stalled at some point in the legislative process. So, while I certainly recognize that Tennessee's life sentence, as applied to juveniles, is lengthy in comparison to other States, upon answering the constitutional question in this case, this Court should defer to the legislative process and the legislature's distinct role in making "broad moral and policy judgments in the first instance [by] enacting [the] sentencing laws." Jones, 141 S. Ct. at 1322; see also State v. Black, 815 S.W.2d 166, 178 (Tenn. 1991) ("Justice Fones, speaking for the Court, stated: 'The validity and humanity of that complaint should be addressed to the Legislature. This Court's authority over punishment for crime ends with the adjudication of constitutionality.'" (quoting State v. Adkins, 725 S.W.2d 660, 664 (Tenn. 1987))). I continue to urge the legislature to take up this important issue.

---

[16] See Josh Rovner, Juvenile Life Without Parole: An Overview, THE SENTENCING PROJECT, (May 24, 2021), https://www.sentencingproject.org/publications/juvenile-life-without-parole/ (summarizing state legislative action since Miller).

[17] See S.B. 0561, 112th Gen. Assem., Bill History, https://wapp.capitol.tn.gov/apps/BillInfo/default.aspx?BillNumber=SB0561&GA=112 (last visited Nov. 16, 2022).

In response to this dissenting opinion, the plurality announces that it "will not shirk [its] duty and ignore an injustice." Respectfully, those of us in dissent are far from shirking our duty and ignoring an injustice. To the contrary, I would submit that the exercise of judicial restraint in the face of bad policy, particularly involving vulnerable juveniles, is perhaps the ultimate exercise of our judicial responsibility. Indeed, the eloquent words of Justice Felix Frankfurter directly address this point: "For the highest exercise of judicial duty is to subordinate one's personal pulls and one's private views to the law of which we are all guardians—those impersonal convictions that make a society a civilized community, and not the victims of personal rule." Tom C. Clark, Mr. Justice Frankfurter: "A Heritage for All Who Love the Law," 51 A.B.A. J. 330, 332 (1965).

I stress that I do not arrive at my conclusion today without serious concerns and reservations. Although I cannot say that Mr. Booker's sentence is unconstitutional under the Eighth Amendment to the United States Constitution, the words of Justice Brett Kavanaugh in Jones are equally or perhaps even more appropriate in the context of this case:

> To be clear, our ruling on the legal issue presented here should not be construed as agreement or disagreement with the sentence imposed against Jones. As this case again demonstrates, any homicide, and particularly a homicide committed by any individual under [eighteen], is a horrific tragedy for all involved and for all affected. Determining the proper sentence in such a case raises profound questions of morality and social policy. The States, not the federal courts, make those broad moral and policy judgments in the first instance when enacting their sentencing laws. And state sentencing judges and juries then determine the proper sentence in individual cases in light of the facts and circumstances of the offense, and the background of the offender.

Jones, 141 S. Ct. at 1322.

### III. CONCLUSION

For these reasons, I am compelled to hold that Tennessee's life sentence, as applied to juveniles, does not violate the Eighth Amendment, as interpreted by the United States Supreme Court in Miller. In reaching this conclusion, I suggest the parallel of Justice Kavanaugh's words in Jones applies here. State courts must not make broad moral and social policy judgments. Our constitution leaves those decisions to the legislative branch. The majority's conclusion today to the contrary impermissibly crosses the parameters imposed on our judiciary by our constitution. While perhaps representing good, sound policy, the majority's conclusion fails to allow this issue to be resolved appropriately "by our Legislature as the representatives of the people." State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988).

For these reasons, I respectfully dissent.

_____
JEFFREY S. BIVINS, JUSTICE